## WILLIAMS et al. v. DELACROIX CORPORATION. *
### No. 15010.

Court of Appeal of Louisiana. Orleans.
April 15, 1935.

Thos. E. Furlow, of New Orleans, for appellants.

Brian & Brian, of New Orleans, for appellee.

JANVIER, Judge.

This is a suit to recover a portion of the amounts paid to defendant, or to its predecessor in title, by plaintiffs, under an uncompleted contract which plaintiffs contend was an agreement having as its object the sale of real estate, but which defendant maintains contemplated the leasing of the said land for trapping purposes.

On March 17, 1927, Acme Land & Fur Company was the owner of certain salt marsh land in the parish of St. Bernard, which said land was valuable mainly because of the presence thereon of numerous fur-bearing animals known as muskrats. On that day the said company entered into a contract with the three plaintiffs in the suit at bar, Alcide Williams, Andrew Rhodes, and Sam Sanchez, under which, as defendants interpret it, two lots of the said land known as lots "O" and "Q" of the Swift tract were leased for trapping purposes to the said three plaintiffs for a period terminating on February 5, 1931, for the sum of $3,500 for the full term. Of the said sum,

*Rehearing denied May 13, 1935. Writ of error refused by Supreme Court May 22, 1935.

$422.45 was paid either in cash, or by the delivery of furs valued at that amount, and for the balance four notes were given, one for $770 payable on December 10, 1927, one for $770 payable on December 10, 1928, one for $770 payable on December 10, 1929, and one for $767.55 payable on December 10, 1930. These notes bore interest at 8 per cent. from date.

Upon the execution of the contract the three parties named were granted permission to trap upon the said land during the term of the contract. The agreement also contained a provision that, in the event of revocation of the contract for any cause, "including non-payment of any note, or interest, whatever amount of money has been paid on account of said permit shall be retained by the company as liquidated damages for breach of this contract, and as consideration for the permit rights accorded to the trapper between the date of the issuance of this permit and the date of the revocation thereof." Still another provision of the contract was that should the three parties named make all payments, when due, the owner of the land would transfer to them title to the said land. A final provision read as follows: "It is expressly understood and assented to by the trapper that the foregoing clause of this contract agreeing to transfer title of said land to him, is an additional concession on the part of the Company, contingent entirely upon the complete performance of this contract by the trapper and creates no vested right in said trapper prior to the time of his complete fulfillment of all obligations; and that in the event of any violation of this contract by the trapper, either by nonpayment of his notes, interest or charges, or by his conduct on said land and toward the wild life thereon, he shall nevertheless be peremptorily liable, at the option of the Company, to a cancellation of this permit, and thereafter shall be purely a trespasser as regards any attempt on his part to enter on said land."

Shortly after the contract was entered into the Mississippi river, which flowed nearby, rose to such an extent that, because of the grave danger to more thickly settled communities, it was deemed necessary by the state officials to create an artificial crevasse to relieve this condition, and a point known as Caernarvon was chosen for that purpose. As a result of this artificial crevasse, the lots O and Q, together with a large portion of the surrounding country, were inundated, and no trapping could be indulged in during the following trapping season; that is, during the winter of 1927–1928. The board known as the Reparations Commission, having been created for the settlement of such losses as had been caused by the artificial crevasse, it was agreed between the owners and the three plaintiffs that the claim for trapping losses for that year should be settled for the sum of $1,239.45 and that, of that amount, $617 would be devoted to the retirement of the first note for $770 with interest, and that the balance, $422.-45, would be delivered to the three plaintiffs. It will be noted that the amount delivered back to the plaintiffs, $422.45, was the identical amount which they had paid as the first installment provided for under the contract of March 17, 1927.

The Delacroix Corporation, the present defendant, having, on October 6, 1930, acquired all of the rights of the original owner, the Acme Land & Fur Company, then entered into a new contract with the three plaintiffs which contained all of the stipulations of the original contract, but which provided for the payment of the then due balance on a new and extended plan. It was also agreed that, because of the apparent necessity for permitting the rats to replenish themselves by natural process, it was deemed advisable to abandon trapping activities during the season 1928–1929. An agreement was entered into by which that trapping year was eliminated from the contract and the maturity of the obligations were to that extent extended. In other words, the new contract took into consideration the fact that for two years there had been no trapping activities on the land in question and it extended the term of the contract by that period of time. It also took into consideration the payments which had been made on the original contract, gave credit therefor, and provided for payment of the balance due over a new period of four years.

The three plaintiffs failed to comply with their obligations to make payments and the present owners of the land, the Delacroix Corporation, notified them of intention to cancel the contract and retain as liquidated damages and as rental charges the amounts already paid. This suit resulted.

The controversy divides itself into two parts: First, was the contract, through which plaintiffs came into possession of the lands, one of lease, or was it one looking to the purchase of the lands? and, second, if, as contended for by plaintiffs, it was one looking to the purchase of the lands, could the vendor cancel it because of default in the payment of a part of the purchase price and at the same time retain all that had up to the time of can-

cellation been paid on account of the purchase?

Plaintiffs contend that the contract had as its principal object the transfer of title from the then owners to plaintiffs and that the provisions under which they were permitted to trap on the lands during the period within which they were required to pay the price were merely incidental to the principal object of the contract, and did not change its nature from one of sale to one of lease. Thus, they concede that although the owners may, because of default in the payment of a part of the purchase price, cancel the contract, they maintain that the owners may not retain out of what has already been paid more than a sum equal to the fair rental value of the property during the period of occupancy by the prospective purchasers. They cite Heeb v. Codifer & Bonnabel, Inc., 162 La. 139, 110 So. 178, in which it was held that a contract looking to the sale of real estate was arbitrary and unreasonable because it provided for the forfeiture, in the event of default, of all that had been paid on account of the purchase price up to the time of the forfeiture. They concede, however, that it is well settled that out of the amount already paid on account of the purchase price there may be retained as rental an amount equal to the fair rental value of the property during the term of actual occupancy. In this connection they cite Pruyn v. Gay, 159 La. 981, 106 So. 536, in which it was held that the amount retained represented the fair rental value, and they also call attention to Dambly v. Burrell (La. App.) 147 So. 711, in which the amount retained was held to be excessive.

One other point is made by plaintiffs, and that is that in determining what is a fair rental value, the conditions prevailing at the time of the occupancy must be considered, and not those which existed at the time the contract was executed.

Defendants contend that none of the cases cited are pertinent here, because in each of them there was involved a contract having as its principal object the sale of real estate, whereas here, they maintain, the moving consideration for the making of the contract was the use of the land for trapping purposes during the term fixed in the agreement; that parties to a rental contract may agree between themselves as to the value of the use of the property during the term of the lease and that, when they do so, the amount agreed upon becomes the value as between them, and that the amount agreed upon, when paid, is fully earned by the owner of the land; that

the tenant may not later claim that, because of changed conditions, the amount fixed was too great, or that the contract is other than what it purports to be.

Defendants finally contend that, even if it be conceded that the contract in question really evidences an agreement looking to the sale of the land, and that, thus, the principles announced in the various cases cited have application here, nevertheless the rental value of the land in question both at the time of the execution of the contract and during the term of actual occupancy was at least as great as the amounts paid by the three plaintiffs, and that therefore, even under their own theory of the legal status of the matter, nothing is due to plaintiffs.

From a judgment dismissing their suit, plaintiffs have appealed.

We turn, first, to a study of the evidence with reference to the amounts paid by the plaintiffs since the execution of the contract, and we find that they claim to have paid the sum of $2,140.66, and we find, also, that defendants also admit the receipt of a sum so nearly approximating that amount that the difference, if any, may be overlooked. Plaintiffs contend that, since they occupied the property for only two seasons, the annual rental which they have been required to pay amounts to $1,070.33. They, however, overlook one very important fact, i. e., that of the total amount which they claim to have paid $1,230.45 was not paid by them at all, but was paid by the Reparations Commission, which by law had been granted authority to fix the damage caused by the artificial crevasse. During the trapping season of 1927–1928 no trapping activities were conducted. Plaintiffs, in calculating the time during which they actually occupied the land, do not include that year, and yet they seek to claim credit for the amount paid during that year, not by them, but by those made responsible by law for losses sustained during that period.

If, because of the crevasse, they are not to be charged rent for that period, then any sum produced by the land during that period belongs not to them, but to the owners of the land. It thus appears that when, as a result of their default and the consequent cancellation of the contract, it became necessary to determine just what should be charged to them for rent during their occupancy and just what payments they should be given credit for, the payment made by the Reparations Commission should not be credited to them at all. Stripped of all its mathematical calcu-

lations, the bare fact stands out that all that they actually paid was $893.21. This amount is arrived at by deducting from the amounts they claim to have paid, $2,140.66, the amount paid by the Reparations Commission, $1,247.- 45. Therefore, for two years' occupancy they are actually out of pocket the sum of $893.21, which amounts to $446.61 for each year.

■ There is much evidence as to the value of the trapping rights on land of the character which is here involved and much time is devoted to an attempt to show that there was a substantial drop in value between the time of the execution of the original agreement, March, 1927, and the value at the time of actual occupancy, 1929–1930 and 1930–1931, but we are unable to agree that, even if we should fix the value as of the time of actual occupancy, the evidence establishes the fact that $446.61 a year for two lots is in excess of a fair rental value. In this connection we cannot entirely distract our minds from a consideration of the fact that in the contract itself it was agreed that a fair annual rental charge was $770.

It would be most unfair in such a case as this to fix the rental value in accordance with conditions existing at the time of the cancellation, rather than with those prevalent at the time of the confection of the agreement. To do this would be to permit a prospective purchaser to take advantage of the prospective vendor in any case in which the value of property should substantially drop between the time of the execution of the contract and the time fixed for the final payment of the last installment. In other words, a purchaser might agree to pay $1,000 for a piece of land and to make payment at the rate of $100 a year for ten years and to obtain title at the end of the tenth year. If, by reason of any calamity, the value of the land should substantially drop, the purchaser, after a year or two, might refuse to make further payments, and he not only would be released from the obligation of completing his contract, but he would have the right to demand back from his vendor a substantial portion of what he had already paid by reason of the fact that the rental value of the land had dropped considerably after the execution of the contract. But, even if it be conceded that the rental value at the time of the actual occupancy is to be the governing factor, the evidence shows that the rental value at that time was at least as great as the amount actually paid by the three plaintiffs.

■ Counsel devote considerable time to the argument that under the contract the plaintiffs were required to pay the taxes, and they estimate that this increased the price by a considerable sum.

Whatever the contract may have required in this regard, the taxes were not paid by the plaintiffs, and, in figuring what they did actually pay, in order to determine whether they paid more than a fair rental value, we need not take into consideration any such items as taxes which were not paid by them.

■ Having reached the conclusion that, even if it be conceded that the contract should be construed as one of sale and not one of lease, nevertheless plaintiffs cannot recover, it is, of course, unnecessary that we determine definitely just what interpretation should be placed upon the contract, because in neither event, whether it be one of sale or one of lease, are plaintiffs entitled to receive back any of the amounts which they have paid. If the contract was one of lease, then the amounts paid were the agreed annual payments for the rental of the property. If it was one of sale which was not carried to completion, then the amounts paid, being not in excess of the fair rental value, may be retained by the vendors under the doctrine announced in the cases cited.

For the reasons assigned it is ordered, adjudged, and decreed that the judgment appealed from be, and it is, affirmed at the cost of appellants.

Affirmed.